1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER W.,<br><br>                          Plaintiff,<br><br>v.<br><br>MARTIN O'MALLEY, Commissioner of Social Security,[1]<br><br>                          Defendant. | Case No.: 23-cv-01107-JLB<br><br>**ORDER GRANTING PLAINTIFF'S MERITS BRIEF**<br><br>**[ECF No. 13]** |

On June 16, 2023, Plaintiff Christopher W. ("Plaintiff") filed a complaint pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits.

---

[1] Martin O'Malley became the Commissioner of Social Security ("the Commissioner") on December 20, 2023.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

(ECF No. 1.) Before the Court and ready for decision is Plaintiff's merits brief.[2]  (ECF No. 13.)  The Commissioner filed an opposition (ECF No. 15), and Plaintiff filed a reply (ECF No. 16).  For the reasons set forth herein, the Court **GRANTS** Plaintiff's merits brief, reverses the Commissioner's decision, and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I.    PROCEDURAL BACKGROUND

On or around April 17, 2020, Plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act, alleging disability beginning April 30, 2016.  (Certified Administrative Record ("AR"), at 182–83.)  Based on a prior application for a Period of Disability and Disability Insurance Benefits and Supplemental Security Income filed on May 30, 2018, Plaintiff was previously found disabled for the closed period of April 30, 2016, through September 30, 2019, upon Administrative Law Judge Jay E. Levine's final, December 20, 2019 decision. (AR 82–96.)   After the instant application's initial denial and upon reconsideration (AR 125–28, 129–37), Plaintiff requested an administrative hearing before Administrative Law Judge Andrew Verne ("ALJ") (AR. 142–43).  An administrative hearing was held on June 10, 2021.  (AR 55–81.)  Plaintiff, represented by counsel, gave testimony, as did a vocational expert ("VE"). (AR 55–81.)

As reflected in his June 28, 2021 Decision ("Decision"), the ALJ found that Plaintiff was not under a disability, as defined in the Social Security Act, from December 21, 2019, through the date of decision.  (AR 17–30.)[3]  The Decision became the Commissioner's

---

[2] Plaintiff submitted this filing as a Motion for Summary Judgment. However, such procedure is displaced by merits briefing under the Supplemental Rules for Social Security Actions Under 42 U.S.C. § 405(g), Rule 5.  Thus, the Court will construe Plaintiff's filing to be his Merits Brief.

[3] Administrative Law Judge Andrew Verne found the presumption of continuing non-disability to have been rebutted due to a showing of changed circumstances affecting the issue of disability.  (AR 20.)  Therefore, he applied no *res judicata* effect to the non-

final decision on June 28, 2021, when the Appeals Council denied Plaintiff's request for review.  (AR 6–11.)  This civil action followed.

## II.    PLAINTIFF'S RELEVANT MEDICAL HISTORY

The record reflects that Plaintiff's (**DOB**: July 1988) relevant medical history and claim for benefits revolve centrally around a diagnosis of Postural Orthostatic Tachychardia Syndrome ("POTS"), and a seizure disorder that some, but not all, of his medical providers have linked to POTS.  (*See* AR 370, 406, 422.)  In sum, when Plaintiff first began having seizure-like events, he was diagnosed with epilepsy and put on anti-seizure medication. (AR 409.)  However, an electroencephalogram ("EEG") in February 2019 was negative for abnormal brain activity.  (AR 258, 340, 373, 376.)  A tilt-table test in May 2018 yielded "profoundly abnormal" results and was the basis for his eventual POTS diagnosis. (AR 252, 387, 451.)  POTS is a cardiac disorder, not a neurological disorder.  (AR 41.)  Thereafter, Plaintiff was taken off anti-seizure medications and treated for POTS rather than epilepsy.  (AR 41, 395.)

### A. Medical History through Closed Period of Disability, December 21, 2019

Plaintiff's symptoms began in or around 2016. (AR 409.)  Early UC San Diego Health records reflect that symptoms in November 2017 included seizures, dizziness, nausea and vomiting, hypertension, and tachycardia.  (AR 250.)

Among the earliest physician notes are those from a March 17, 2018 visit with Dr. Bui of Blue Coast Cardiology, who noted:

> Two years ago, without any provocation, he starting [*sic*] having seizures. He describes an aura preceding the event, like a light flashing before his eyes. He then experiences nausea and nystagmus. He was evaluated by neurology and then put on a number of antiseizure meds . . . The seizures seem to have stopped, but he continues to have episodes of dizziness about twice a month. These are associated with nausea, vomiting,

---

adjudicated period and determined the period at issue began the day after the prior decision: December 21, 2019.  (AR 20–21.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> nystagmus. His mother notices that his pupils are large during those time.  During his last neurology appt, he had a spell . . . Prior to the seizures, about 5 years ago, he was drinking rather heavily to the point of developing fatty liver.  He drank like that for 2 years, then stopped for 1 year before the seizures started.

(AR 408.)

Dr. Bui noted a prior diagnosis of epilepsy but questioned whether the symptoms could in fact be caused by POTS instead.  (AR 409.)  Plaintiff continued to seek treatment and diagnosis throughout 2018, including a tilt table test with "profoundly abnormal" results, the basis for his eventual formal POTS diagnosis. (AR 252, 406.)  Plaintiff was referred to a neurologist, who believed his seizures may in fact be due to POTS, and was prescribed metoprolol, "which has helped."  (AR 406.)  Dr. Bui noted mixed progress on September 20, 2018: "He did have 1 episode of aura and syncope, but this is a significant decrease from before.  He remains nauseated and vomiting, losing about 20 [pounds] since his last visit."  (AR 403.)

In September 2019, Plaintiff presented at Tri-City Medical Center emergency department with "seizure-like" symptoms, though an EEG was negative for abnormal brain activities. (AR 258.) Plaintiff's complaints included multiple, recent seizure-like episodes, with visual auras and a shaking body.  (AR 258.)  The records note a history of POTS and alcohol abuse.  (AR 259.) At the time, Plaintiff had a metoprolol prescription for his symptoms.  (AR 258.)

Plaintiff's medication changed in 2019, with a reduction in metoprolol from 50mg to 25 mg daily due to side effects. (AR 373.)   Dr. Bui described Plaintiff as "now doing well back on metoprolol 50 and 25 mg."  (AR 373.)  Though Plaintiff continued having cycles of feeling well and poorly, the cycles were "not as bad as symptoms had been prior to metoprolol." (AR 373.)  Plaintiff's condition appeared to have likewise improved by October 2019, with POTS, "controlled on metoprolol and salt tablets . . ." (AR 370.)  Dr. Bui's notes on October 21, 2019, state that "in August 26, he had a seizure, and that on the previous September 11 he had visited the hospital for trembling hands and blood sugar in

the 70s." (AR 370.)  Dr. Bui believed these symptoms to be caused by POTS, rather than epilepsy, noting that UC San Diego Neurology did not believe Plaintiff had suffered a seizure. (AR 370.)

Around this time, Plaintiff testified at his November 20, 2019, hearing for his prior claim.  Plaintiff testified that his driver's license was no longer active due to "seizures, or what [his doctors] call episodes." (AR 38.)  He confirmed, in response to the ALJ's questioning, that he was on three medications at that time. (AR 50.)  Plaintiff testified that he had to stop working due to the episodes described above, and that his doctors determined the issue was POTS, rather than epilepsy. (AR 40–41.)  He described the episodes as being "more controlled . . . one to two times a month . . . sporadic . . . I can only know when they are coming . . . because I see, they call it an aura, and then I have enough time to lay down so I don't fall on my face." (AR 41.)  Plaintiff stated that when not having episodes, he went to the gym approximately five times per week, and that he helped around the home when he could. (AR 43–46.)  He testified that he had no current or past problems with alcohol or drugs, besides one DUI years before. (AR 39–40.)

On examination by his attorney, Plaintiff testified that his symptoms included "blurred vision" and vision affected by bright neon-like colors—a condition occurring "most of the time," and not merely during POTS episodes. (AR 47–48.)  He stated that the addition of Gatorade to his diet had led to significant improvement since October 2019, though he still experienced "vomiting, lack of appetite, lack of sleep, and the vision." (AR 49.)  Prior to October 2019, he experienced episodes three to five times a month, with recovery from them taking four to five hours. (AR 50.)  However, he had suffered only one episode in the month since. (AR 50.)

*B. Medical History Post-December 21, 2019*

Medical records for a visit with Dr. Bui on December 30, 2019, note that "[Plaintiff] remains stable on metoprolol succinate 50 mg BID, along with Gatorade." (AR 367.)  Further records from a March 2020 visit indicate that Plaintiff had "been having cycles of nausea, vomiting, no sleep." (AR 364.)  As of April 30, 2020, Dr. Taub, of UC San Diego

5

Health noted Plaintiff suffering "presyncopal" and "syncopal" episodes once a month, which were reported to include waves of nausea, vomiting, and sleeplessness.  (AR 307.) "His bothersome symptoms are [inability] to focus with his vision . . . 'foggy' memory. Has difficulty with coordination at times."  (AR 307.)  Plaintiff at times experienced tremors. (AR 346.)  When Plaintiff was not suffering an episode, he was a frequent runner, often running several miles per day.  (AR 307.)  Plaintiff's diagnoses at that time, by UC San Diego Health gastroenterologist Dr. Kunkel, were POTS syndrome as diagnosed on a table test, and a seizure disorder.  (AR 307.)  Dr. Kunkel noted that Plaintiff had "cyclical vomiting with nausea . . . .  He has been started on TCA (amitriptyline) by outside provider and so far this has extinguished his CVS symptoms."  (AR 315.)

Dr. Taub stated that "[Plaintiff] tells me he has good days and bad days. On bad days, he has dizziness, nausea, light-headedness, and he is unable to run and go to the gym. He has lost 3 pounds unintentionally over the past year."  (AR 307.)  Notes from Dr. Bui conflict with the reports of weight loss. (AR 340.)  Dr. Taub reported "good functional status . . . some benefit with a beta blocker." (AR 310.)  As of April 21, 2020, Plaintiff "recently started on amitriptyline 25 mg nightly by his POTS specialist and this has helped immsenely [*sic*] with his sleep." (AR 314.)  "[He] has not had any episodes of nausea/vomiting/abdominal pain since starting on this medication."  (AR 314.)  Dr. Bui likewise noted that "the POTS has been controlled on high dose metoprolol, but not completely." (AR 339.)

Examination notes from a telemedicine appointment with his primary care physician, Dr. Hall of Optum Care, in April 2020, contain similar findings. Dr. Hall noted chronic conditions including weight loss (stable), epileptic seizures related to external causes, not intractable (remission), alcohol dependence (remission), nausea with vomiting (chronic), and orthostatic hypotension (chronic).  (AR 350.)  Dr. Hall also noted a positive finding for tremors, which "worsened during episodes of POTS" and that Plaintiff had "[n]o episodes since I last saw him." (AR 351–52.) Dr. Hall found that certain symptoms were "suspicious for alcohol withdraw," including some of the seizure-like symptoms and

loss of consciousness.  (AR 350–51.)  Plaintiff's medical history at this visit reflects prior issues with alcoholism and a sobriety date in September 2019.  (AR 350–51.)  Upon return televisit in June 2020, Dr. Bui noted that Plaintiff was "feeling very poorly . . . in bed all day throwing up." (AR 342.) Dr. Bui again voiced uncertainty as to what was causing Plaintiff's vomiting.  (AR 342–43.) However, Dr. Bui restated that he always felt Plaintiff's seizures were caused by POTS.  (AR 342.)  He also noted, "We have been following him for POTS, controlled on metoprolol and salt tablets," that "he remained stable on metoprolol succinate 50 mg BID, along with Gatorade," and that, again, "[a]t this point, the POTS has been controlled on high dose metoprolol, but not completely." (AR 342–43.)

In a July 2020 visit, Dr. Hall recorded  Plaintiff's POTS "[m]anifesting with sleep instability, cognitive fogginess, cyclic nausea and vomiting, occasional diarrhea, early satiety, extreme fatigue . . . [e]pisodes of visual aura prior to loss of consciousness." (AR 346.)  Dr. Hall attributed Plaintiff's current vomiting and nausea to POTS and noted "[l]ong-standing cyclic episodes occurring about twice monthly lasting for 12-24 hours without obvious provocation . . . sometimes gets episodes of syncope afterwards." (AR 346.)  Additionally, he noted Plaintiff exercised multiple times per week. (AR 347.)

Notes by Dr. Taub on June 26, 2020, reflect a diagnosis of POTS and seizure disorder, and that Plaintiff

> reports he has a stretch of 2-3 weeks of really good then really bad. Reports May 25-28 was really bad, has non[-]stop vomiting, difficulty eating, lightheaded, dizzy, insomnia, tries to drink as much water and tries to take meds but keeps vomiting. Then he recovers for 3 days so it takes about a week to get back to good days.

(AR 422.)  The notes further reflect that Plaintiff ran three miles daily and lifted weights when feeling good, that he had active medications for POTS including fludrocortisone, sodium chloride, and metoprolol.  (AR 422, 433.)

On June 16, 2020, Dr. Sin, of the State Agency, issued a report regarding Plaintiff's condition finding, in summary, that Plaintiff had POTS, Plaintiff's POTS caused his

episodes, there was "some benefit" with beta blocker, salt tablets and Gatorade, he experienced presyncope/syncope once a month, and he had "[g]ood functional status, runs 3 miles twice a day, goes to gym." (AR 107.)  Dr. Sin assessed Plaintiff's condition as "non-severe since 10/1/19."[4]  (AR 107.)

A September 3, 2020, televisit with Dr. Bui resulted in nearly identical findings to that of the earlier June 2020 visit: in summary, that Plaintiff's POTS was controlled, but not completely, by metoprolol and salt tablets, taken with Gatorade. (AR 357.)  However, as in June 2020, Dr. Bui noted that Plaintiff was feeling poorly on that day, throwing up all day.  (AR 357, 379.)

Plaintiff's health records continue to 2021.  Notes from a January 7, 2021, visit to Dr. Bui reflect that POTS was controlled on metoprolol and salt tablets, but "not completely."  (AR 450.)  Dr. Bui noted that "Since his last visit, he continues to have what sounds like visual migraines. He has not slept for 3 days. Feels poorly." (AR 450.)  For his vomiting, Plaintiff had a prescription Prochlorperazine Maleate and Amitriptlyine, though "nothing [had] really worked." (AR 450–51.)  At a January 21, 2021, visit with Dr. Bui Plaintiff's condition was "stable on metoprolol succinate 50 mg BID, along with Gatorade" with his POTS "controlled on metoprolol and salt tablets." (AR 448.)  Plaintiff sought a decrease in his amitriptyline due to side effects.  (AR 448.)  Dr. Bui also noted the eye condition "nystagmus," referring Plaintiff for further treatment.   (AR 448.)  Ongoing medication included the Metoprolol, Ondansetron, Prochlorperazine Maleate (for vomiting), and Amitriptyline HCl.  (AR 448–49.)

Notes from a February 2021 telemedicine visit with Dr. Hall reflect that further GI motility studies were deferred because the nausea and vomiting could be attributed to POTS. (AR 437.)   In addition to nausea and hypotension, Dr. Hall noted "vision

---

[4] Dr. Kalmar, of the state agency, who conducted an October 2020 assessment, concurred without elaboration.  (AR 119.)

disturbance" and requested a consult with ophthalmology.  (AR 438.)  The notes reflect a change/renewal of metoprolol (though with a quantity and amount of zero) and termination of prochlorperazine upon February 5, 2021.  (AR 439.)

On April 10, 2021, Plaintiff visited Tri-City Medical Center emergency medicine after his mother found him lying on the floor intoxicated, following an alcohol-related emergency room visit the day prior.  (AR 441.)  The treating physician, Dr. Chiang, noted no active prescriptions, and a problem/past medical history list of alcohol abuse and POTS. (AR 441.)  A review of symptoms revealed no recent vision problems, no heart palpitations, no shortness of breath or gastrointestinal issues, and a lack of presenting symptoms beyond alcohol intoxication.  (AR 441.)

Dr. Bui's final note on April 17, 2021, provides the last insight to Plaintiff's condition from a medical provider.  Dr. Bui once again noted stability, POTS controlled under metoprolol, and that Plaintiff "[was] doing well this month on current meds."  (AR 445–46.)  Dr. Bui likewise noted:

> Last month was a bad month, but this month has been very good. This is the best that I have seen him. He looks refreshed, has lost weight. Still with a bit of nausea. He stopped amitriptyline. Cannot identify exactly what was helping him. He went to see ophthalmology about nystagmus and was told . . . [it] is benign.

(AR 445.)

Plaintiff provided testimony on his condition during the June 10, 2021, hearing on this matter before the ALJ.  Asked why he was not presently working, he testified that it was due to his "still having seizures . . . still having cyclical stages . . . when [he got] dizzy, lightheaded, no appetite . . . can't sleep . . . and lack of coordination. [His] vision's gone, and when it's really bad, [he] vomit[s], like, for a good 24 hours . . . that lasts . . . three to four days, then it's usually two to three times a month."  (AR 64–65.)  Plaintiff stated he had a "clean and sober date" in 2019, and that he had only struggled with alcohol abuse on one occasion since then, in April 2021.  (AR 65–66.)

Under examination by his attorney during the hearing, Plaintiff expanded on POTS, his "main diagnosis," testifying that he believed, based on his doctors, that the nausea, vomiting, and discoordination were POTS-related.  (AR 67.)  He stated that he was on medication for POTS and waiting to see a specialist in San Diego, and that when he was feeling well he could jog and engage in a normal life, though his vision was "still not all there" and his coordination was "iffy."  (AR 68.)  When an episode came on, however, he struggled to stand, walk, or even sit without falling, and his vision and coordination became worse. (AR 68.)  Plaintiff described an incident months prior in which he fell during a "seizure" and knocked out his tooth.  (AR 69.)  He likewise testified that during these episodes, which each lasted three to four days, his hands trembled so badly that he "[could not] even write." (AR 71.) Plaintiff did not state the frequency of these episodes but did not object to the ALJ's characterization of "at least a couple times a month."  (AR 69.)

## III.   SUMMARY OF THE ALJ'S DECISION

In rendering his decision, the ALJ followed the Commissioner's five-step sequential evaluation process.  20 C.F.R. § 404.1520(a)(4).  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 21, 2019, the alleged onset date.  (AR 23.)

At step two, the ALJ found that Plaintiff had the following severe impairments: POTS and epilepsy.  (AR 23.)  The ALJ found that Plaintiff's alleged hypertension and alcohol abuse did not rise to the level of severe impairments as described in the Regulations.  (AR 24.)

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Commissioner's Listing of Impairments.  (AR 24–25.)

Next, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform "medium work" with the following limitations:

> [T]he [Plaintiff] could never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs; never balance and

occasionally stoop, kneel, crouch or crawl.  Lastly, he would need to avoid all exposure to workplace hazards, such as unprotected heights, dangerous or fast-moving machinery, etc.

(AR 25.)

For purposes of his step four determination, the ALJ determined that Plaintiff is capable of performing past relevant work as a Valet Parker; a Bartender; or as a Foodservice Worker, relying on the VE's testimony.  (AR 28.)  The ALJ further determined that this work does not require the performance of work-related activities precluded by Plaintiff's RFC.  (AR 28.)  Accordingly, the ALJ found that Plaintiff was not disabled at step four.  (AR 29.)

Although the ALJ determined that Plaintiff could perform past relevant work, he nonetheless proceeded to step five pursuant to 20 C.F.R. 404.1520(f)–(h).  (AR 28–29.)  Based on the VE's testimony that a hypothetical person with Plaintiff's vocational profile and RFC could perform the requirements of occupations that existed in significant numbers in the national economy (*i.e.*, Automatic Machine Attendant, Hand Packager, or a Laundry Worker II), the ALJ found on this alternative basis that Plaintiff was not disabled under the law from December 21, 2019, through the date of decision.  (AR 29.)

## III.   PLAINTIFF'S CLAIMS OF ERROR

As reflected in his merits brief, Plaintiff raises the following allegations as the grounds for reversal and remand:

1.    The ALJ failed to provide an RFC that encompassed the combination of Plaintiff's claimed impairments, specifically the ALJ failed to properly consider: (a) Plaintiff's tremors;[5] (b) Plaintiff's blurred vision; and (c) Plaintiff's seizures (or episodes) with nausea and vomiting.  (ECF No. 13-1 at 16–19.)

---

[5] Plaintiff does not expressly argue that the ALJ should have found Plaintiff's hand tremors to be a medically determinable impairment.  Rather, Plaintiff seems to argue that the ALJ failed to properly consider the tremors as a symptom of POTS.  (ECF No. 13-1 at 14–16; AR 24.)

2.      The ALJ failed to set forth clear and convincing reasons for discrediting Plaintiff's symptom testimony.  (ECF No. 13-1 at 21–22.)[6]

3.      Because of the ALJ's alleged failure to provide an RFC that encompasses the combination of claimed impairments, his determination that Plaintiff is limited to medium work was not supported by substantial evidence in the record.  (*Id.* at 19–20.)

4.      The ALJ erred in his analysis of Plaintiff's past relevant work.  (*Id.* at 20–21.)

## IV.    STANDARD OF REVIEW

### A. The Standard of Review under 42 U.S.C. § 405(g)

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether the Commissioner's findings are supported by substantial evidence and whether the proper legal standards were applied.  *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991).  Substantial evidence is "more than a mere scintilla" but less than a preponderance.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229(1938)); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Richardson*, 402 U.S. 389 at 401); *Desrosiers v. Sec'y of Health & Hum. Servs.*, 846 F.2d 573, 575-76 (9th Cir. 1988).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401; *Smolen*, 80 F.3d at 1279.  The Court must review the whole record, considering evidence that supports the Commissioner's conclusion as well as that which undermines with it.  *Smolen*, 80 F.3d at 1279; *Green v. Heckler*, 803 F.2d 528, 529-30 (9th Cir. 1986).  Where evidence is susceptible of more than one rational interpretation, the Commissioner's decision must be upheld.  *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984).  However, a court may not affirm the ALJ's determination "for a reason that the ALJ did not assert."  *Ferguson v. O'Malley*, 95 F.4th 1194, 1203 (9th Cir. 2024).

---

[6] Due to the overlap between this allegation and the allegation that the ALJ failed to provide an RFC that encompassed the combination of Plaintiff's claimed impairments, the Court addresses the credibility determination first.

1    **V.    DISCUSSION**

2       To qualify for disability benefits under the Social Security Act, a claimant must

3   show: (1) the claimant is unable "to engage in any substantial gainful activity" because of

4   a medically determinable impairment that can be expected to result in death or that has

5   lasted or can be expected to last for a continuous period of twelve months or more; and (2)

6   the claimant is unable to perform their previous work or engage in any other kind of

7   substantial gainful work which exists in the national economy because of the severity of

8   the impairment.  *See* 42 U.S.C. § 423(d)(1)(A), (d)(2)(A).

9   **A. The ALJ Did Not Set Forth Clear and Convincing Reasons to Discount**

10      **Plaintiff's Symptom Testimony**

11          a.    *Legal Standard*

12      "[S]ubstantial evidence does not support an ALJ's RFC 'if the ALJ improperly

13  rejected [the claimant's] testimony as to the severity of his pain and symptoms.'"

14  *Ferguson*, 95 F.4th at 1199 (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir.

15  2007)). In determining whether the claimant's subjective symptom testimony is credible,

16  the ALJ first determines "whether the claimant has presented objective medical evidence

17  of an underlying impairment which could reasonably be expected to produce the pain or

18  other symptoms alleged."  *Id.* (quoting *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir.

19  2014).  "If the claimant satisfies the first step of this analysis, and there is no evidence of

20  malingering, the ALJ can reject the claimant's testimony about the severity of [their]

21  symptoms only by offering specific, clear and convincing reasons for doing so."  *Id.*  If the

22  ALJ fails to provide "specific, clear, and convincing reasons for discounting the claimant's

23  testimony, then the ALJ's determination is not supported by substantial evidence."  *Id.*  The

24  ALJ, in this analysis, "must specifically identify what testimony is credible, and what

25  testimony it finds undermines the claimant's complaints."  *Morgan v. Comm'r of Soc. Sec.

26  Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Brown-Hunter v. Colvin*, 806 F.3d 487, 493

27  (9th Cir. 2015) (citing *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)).

28

23-cv-01107-JLB

b.      *The Parties' Arguments*

Plaintiff argues that the ALJ did not meet his obligation to precisely provide clear and convincing reasons to reject Plaintiff's symptom testimony and did not adequately cite to the record to support his findings. (ECF No. 13-1 at 21–22.) Instead, Plaintiff argues, the ALJ provided only general, unsupported findings to discredit Plaintiff. (*Id.* at 22.) The Commissioner responds that the ALJ gave multiple valid reasons for discounting Plaintiff's subjective complaints. (ECF No. 15 at 7.) With respect to specificity and citations to the record, the Commissioner argues that the ALJ's analysis that preceded the stated reasons for discounting the testimony contain citations to the evidence. (*Id.* at 11.) The Commissioner therefore urges the Court to conclude that the ALJ's separation of his analysis and references to the record from his enumerated rationale does not undermine its validity, as it does not deprive Plaintiff of the ability to contest the findings. (*Id.* at 11–12.)

c.      *Analysis*

The ALJ offered multiple reasons for discounting Plaintiff's symptom testimony:

**Second**[7], Dr. Bui reported on June 4, 2020, that he always felt that the claimant's seizures were caused by POTS; however, he had remained stable on 50mg metoprolol succinate, twice daily along with Gatorade.

**Third**, in progress noted by Dr. Hall, dated April 14, 2020, the doctor noted that at least some of the claimant's seizure spells could certainly be related to alcohol withdrawal induced seizures/loss of consciousness symptoms experienced in September 2019, as they sounded suspicious for alcohol withdrawal with visual hallucinations and elevated liver enzymes.

**Fourth**, on February 5, 2021, Dr. Hall stated that the claimant's recurrent nausea and vomiting was likely related to alcoholic gastritis/pancreatitis, as he has been sober since early September 2019 with resolution of recurrent nausea and vomiting. The claimant had remained sober from September 2019, until the date of this evaluation, and has had normal liver function tests and platelet counts.

---

[7] The ALJ's first reason related only to Plaintiff's benign hypertension, which is not at issue here.

14

**Fifth**, when the claimant was seen in the Tri-City Medical Center Emergency Department on April 10, 2021, the doctor noted that the claimant had no active prescriptions and no active home medications.

**Sixth**, on April 30, 2020, Dr. Taub noted that the claimant reported he was currently running three miles, twice a day, for a total of six miles per day and doing this 4-5 times per week. Additionally, Dr. Taub reported that the claimant had probable POTS, but noted that the claimant had good functional status and some benefit with beta blocker.

**Seventh**, when the claimant was seen in follow-up on June 4, 2020, with Dr. Bui, the doctor reported that they had been following the claimant for POTS, which was controlled on metoprolol and salt tablets. Again on September 3, 2020, progress notes showed that the claimant was unchanged and the doctor reported that the claimant's POTS and benign hypertension were stable.

**Eighth**, the objective evidence of the claimant's medical record does not establish impairments likely to produce disabling pain or other limitations as alleged for any period of 12 or more continuous months.

(AR 26–27.)

Each of the ALJ's stated reasons for discounting Plaintiff's symptom testimony suffers from at least one of two failings: (1) for most, the ALJ fails to clearly identify what symptom testimony he discounted; and (2) for some, the reasons are not supported by record evidence—or are supported only by cherry-picked evidence not amounting to substantial evidence.

Plaintiff testified to multiple POTS-related symptoms that prevent him from working. He complained that when he had an episode, he would vomit all day and be bed-ridden with nausea and dizziness for days afterward. (AR 64–65, 71.) He complained that he suffered from vision problems. (AR 65, 68–70.) He complained that he had tremors associated with these episodes that were sometimes severe enough that he could not write. (AR 70–71.) He testified that at the time of the hearing, his episodes were occurring at a frequency of approximately two to three times per month. (AR 65.)

15

With respect to reason number two (Plaintiff had "remained stable on 50mg metoprolol succinate, twice daily along with Gatorade"), the ALJ failed to indicate precisely which testimony he was rejecting.  (AR 26.)  The Court is left to speculate whether the ALJ is rejecting the testimony that Plaintiff continues to have episodes at a rate of one or two a month, or his testimony about the disabling effects of those episodes, or something else entirely.  Without a tie between the proffered reason and the discounted testimony, the Court is not able to review the validity of the basis.  This lack of explication is even more problematic here because the provider's use of the word "stable," on which the ALJ relies, does not have a clear meaning in this context.  For example, in the same note, Dr. Bui states both that Plaintiff "remained stable on metoprolol succinate 50 mg BID, along with Gatorade," and that "[a]t this point, the POTS has been controlled on high dose metoprolol, *but not completely*."  (AR 343 (emphasis added).)  The ALJ's adopting this term without explanation abstracts the meaning further and leaves the Court with only greater uncertainty.  Because the ALJ does not sufficiently identify which symptom testimony he is rejecting on this stated basis, it is not a clear and convincing reason to discredit the testimony.

For his third reason, the ALJ's basis is that Dr. Hall "noted that at least some of the claimant's seizure spells could certainly be related to alcohol withdrawal induced seizures/loss of consciousness symptoms experienced in September 2019 . . . ."  (AR 26.)  The ALJ did not explain how a seizure in 2019, which might not have been related to POTS, could be a basis for discounting Plaintiff's testimony about the episodes that *are* POTS related—especially when Plaintiff testified that those symptoms lasted far beyond 2019, the year he testified that he quit drinking regularly.  (AR 67.)  Therefore, this is not a clear and convincing reason to discredit Plaintiff's symptom testimony.

In reason four, addressing Plaintiff's complaint of recurrent nausea and vomiting, the ALJ pointed to a February 5, 2021 note by Dr. Hall that these symptoms were likely related to alcoholic gastritis/pancreatitis, "as he has been sober since early September 2019 with resolution of recurrent nausea and vomiting."  (AR 26.)  To the extent the ALJ was

16

suggesting Plaintiff's nausea and vomiting had resolved, his reliance on this portion of Dr. Hall's notes is misplaced.  It is true that, under "Alcoholism," Dr. Hall stated "Recurrent nausea and vomiting likely related to alcoholic gastritis/pancreatitis.  Sober since early September 2019 with resolution of recurrent nausea and vomiting." (AR 436.)  That note appears to be limited specifically to nausea and vomiting resulting from alcohol abuse.  In the same treatment note, under "Nausea and Vomiting," Dr. Hall discussed Plaintiff's ongoing nausea and vomiting associated with POTS:

> Nausea and vomiting[.]  Related to pots.  Has underwent upper endoscopy. Consider gastric emptying study.  Consider Reglan.  Long-standing cyclic episodes occurring about twice monthly lasting for 12-24 hours without obvious provocation associated with mild diarrhea sometimes gets episodes of syncope afterwards . . . Reevaluate in 6 weeks, 1/20-unimproved after eliminating Advil.  4/20-cyclic nausea and vomiting with no obvious cause.  I would like him to have evaluation at UCSD to consider pursuing motility studies-gastric emptying.  7/20-normal abdominal ultrasound.  Seen by UCSD GI-motility studies deferred[] because it is felt pots can explain cyclic nausea.

(AR 437.)  As the record cited does not fairly support the conclusion that Plaintiff's nausea and vomiting were only related to alcoholic gastritis/pancreatitis or that these symptoms had been resolved, this is not a clear and convincing reason to discredit Plaintiff's symptom testimony.

The ALJ's fifth reason was that "when the claimant was seen in the Tri-City Medical Center Emergency Department on April 10, 2021, the doctor noted that the claimant had no active prescriptions and no active home medications." (AR 27.)  An "ALJ is permitted to consider lack of treatment in his credibility determination." *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005).  However, the isolated note cited by the ALJ does not establish that Plaintiff ceased consistent treatment for his POTS or had any actual break in his medications.  Rather, the medical records from Plaintiff's regular providers and Plaintiff's own testimony reflect that Plaintiff was receiving medication during this time.  (AR 68, 445–46 (4/17/21); *cf.* AR 438 (2/5/21).)  Accordingly, this is not a clear and convincing reason to discredit Plaintiff's symptom testimony.

As his sixth reason, the ALJ pointed out that on April 30, 2020, Dr. Taub noted that Plaintiff reported he was running three miles, twice a day, four to five times per week and reported Plaintiff had "good functional status" and "some benefit with beta blocker." (AR 27.) Here, again, the ALJ did not specify what testimony he was discounting. Plaintiff regularly reported that he was able to run when he was not having bad days and suffering from dizziness, nausea, and lightheadedness. (AR 118, 275, 280-281 ("He tells me has good days and bad days. On bad days, he has dizziness, nausea, light-headedness, and he is unable to run or go to the gym." (4/20)); AR 273 ("[W]hen he woke up he . . . went for his run. After our phone meeting with you, maybe 3-4 days later, he had 3 days of vomiting continuously. So he has been glad to be back in his routine." (5/13/20)); AR 422 ("Reports May 25-28 was really bad, has non stop vomiting, difficulty eating, lightheaded, dizzy . . . . When he feels good, he runs 3 miles everyday and also lifts weights." (6/26/20)); AR 119 ("During good times, runs 3 mi daily and lifts weights." (10/20/20)).) Because the ALJ did not specify whether he was discounting the frequency of Plaintiff's reported symptoms or the intensity, the Court cannot evaluate the validity of this basis. Without specification and analysis by the ALJ, it is not clear to the Court that the records of Plaintiff's exercise are inconsistent with his symptom testimony, so this is not a clear and convincing reason to discount it.

The ALJ's reference to "good functional status" and "some benefit" from beta blockers in reason six suffers the same inadequacies as reason number two addressed above. (AR 27.)

Reason seven (POTS reported as "controlled" (June 4, 2020) and "stable" (September 3, 2020) suffers the same deficits as reason number two, as addressed above. (AR 27.)

For reason eight, the ALJ stated only, "The objective evidence of the claimant's medical record does not establish impairments likely to produce disabling pain or other limitations as alleged for any period of 12 or more continuous months." (AR 27.) Without further explanation, this is a mere conclusory statement rather than a basis for discounting

the testimony.  Even if it were adequately supported, because it would be the only surviving basis for discounting Plaintiff's testimony, it would be inadequate.  Although an ALJ may consider whether the alleged symptoms are consistent with the medical evidence as one factor in his evaluation, the ALJ may not disregard a claimant's testimony "solely because it is not substantiated affirmatively by objective medical evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006); *see also* 20 C.F.R. § 404.1529(c)(2) ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.").

For these reasons, the ALJ has not set forth clear and convincing reasons to discount Plaintiff's testimony.  Because the Court cannot determine which symptom testimony the ALJ discounted, the Court cannot determine that the ALJ's findings are supported by substantial evidence and that the proper legal standards were applied.  The lack of clarity about what testimony the ALJ discounted is particularly problematic in this case, where the VE testified that there would be no jobs available in the national economy that Plaintiff could perform if he were to consistently miss two or more days a month, such as was suggested by his testimony.  (AR 79.)

**B. In Determining Plaintiff's RFC, the ALJ Failed to Adequately Evaluate Plaintiff's Hand Tremors, Blurred Vision, and Nausea/Vomiting**

> *a.     Legal Standard*

The "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (Jul. 2, 1996); *see* 20 C.F.R. 404.1545(a); *see also* 20 C.F.R. § 416.945(a).  The RFC is meant to assess "what an individual can still do despite his or her limitations."   SSR 96-8p 1996 WL 374184, at *2. The RFC assessment considers limitations and restrictions attributable to medically determinable impairments regardless

of severity.  *Id.* at *2, *5; 20 C.F.R. 404.1545(a); *see also* 20 C.F.R. § 416.945(a); *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009) (an RFC is defective if it "fails to take into account a claimant's limitations.").

RFCs must address both an individual's exertional and nonexertional capacities. SSR 96-8p, 1996 WL 374184 at *5–6 ("[w]e will consider your ability to meet the physical, mental, sensory, and other requirements of work . . ."); 20 C.F.R. 404.1545(a)(4) 20 C.F.R. § 416.945(a)(4).   Exertional capacity focuses on seven strength demands: "[s]itting, standing, walking, lifting, carrying, pushing, and pulling."  SSR 96-8p, 1996 WL 374184 at *5.   Nonexertional limitations capacity include "manipulative (e.g., reaching, handling)," and "visual (seeing)" limitations, among others.  *Id.* at *6; *see* 20 C.F.R. 404.1545(d).

> The adjudicator must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC. Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone . . .

*Id.* at *5; 20 C.F.R. 404.1545(d) ("[W]e consider any resulting limitations and restrictions which may reduce your ability to do past work and other work in deciding your residual functional capacity.").

### b.   The Parties' Arguments

Plaintiff argues that in crafting the RFC, The ALJ failed to appropriately consider Plaintiff's complaints of: (1) hand tremors; (2) blurred vision; and (3) seizures/episodes with associated nausea and vomiting.  (ECF No. 13-1 at 14–19.)  First, Plaintiff asserts that the ALJ erred by finding that Plaintiff does not have hand tremors "against the evidence" and failing to consider hand tremors in determining the RFC.  (*Id.* at 15–16.)  Plaintiff relies on the ALJ hearing transcript from November 20, 2019; a purported positive diagnosis for "tremors" by Dr. Hall in 2020; a purported acknowledgment by the Social

Security Administration that doctors found signs of tremors in Plaintiff's arms and legs in the Disability Determination Explanation at the initial level, dated June 16, 2020; and a note from Plaintiff's mother, Georgia W., stating that Plaintiff's hand tremors remain at issue, dated August 10, 2020. (*Id.*; ECF No. 16 at 7; AR 207, 346.)

Second, in support of his allegations that the ALJ failed to address his blurred vision, Plaintiff cites to his testimony from the June 10, 2021 administrative hearing (AR 70); the Disability Determination Explanation (AR 117,119); Dr. Kunkel's note of vision and coordination issues (AR 275); and Dr. Hall's notes of blurred vision (AR 252, 439),[8] which purportedly demonstrate serious vision issues. (ECF No. 13-1 at 16–17.)

Third, Plaintiff argues that the ALJ failed to sufficiently address Plaintiff's episodes and their attendant nausea and vomiting. Specifically, Plaintiff argues that the ALJ incorrectly interpreted Dr. Bui's findings to wrongfully conclude that Plaintiff's episodes are now controlled with medication. (ECF No. 13-1 at 17–18.)[9]

> c.    *Analysis*

In his decision, the ALJ discussed the objective medical evidence considered in crafting the RFC. First, the ALJ analyzed medical records from Drs. Taub and Kunkel. (AR 25–26.) The ALJ noted a diagnosis of POTS, and that records as of April 30, 2020, described that "[t]he claimant reported that he experienced good days and bad days with dizziness, nausea and lightheadedness preventing him from running or going to the gym." (AR 25–26.) The ALJ took note that "Dr. Taub reported that the claimant had probable

---

[8] The Court notes that AR 252 actually contains Dr Bui's notes regarding a tilt table test and contains nothing related to blurred vision.

[9] Plaintiff also argues the ALJ erred by relying on sources outside the record, specifically records of a July 2019 visit to Dr. Bui and an October 2019 consultation with Dr. June Yoshii-Contreras. (ECF 13-1 17–18.) On this point, Plaintiff is utterly mistaken. The ALJ decision Plaintiff quotes in making this argument is the December 20, 2019 decision of ALJ Jay E. Levine, not the Decision at issue here. (*Compare* ECF 13-1 at 17 *with* AR 94.)

POTS and noted that he had good functional status and has had some benefit with beta blocker." (AR 25–26.)

The ALJ likewise addressed Dr. Bui's treatment and observations. (AR 26.)  The ALJ noted that Dr. Bui had "been following the claimant for POTS, which was controlled on metopropol and salt tablets."  (AR 26.) He took into account reports of a seizure on August 26, 2019, and hospitalization on September 11, 2019, "because [claimant's] right hand was trembling and his blood sugar was in the 70[s]." (AR 26.)  The ALJ further noted that Dr. Bui attributed the symptoms ascribed to seizures as more likely attributable to POTS and found that Dr. Bui believed the condition was stable on medication.  (AR 26.)

Specifically, regarding Plaintiff's trembling, the ALJ heard Plaintiff's testimony at the June 10, 2021 hearing that he experiences trembling "sometimes" in conjunction with POTS episodes and that, when occurring, render Plaintiff unable to write.  (AR 70–71.)  There was no testimony indicating that this trembling was constant, or that it occurred other than in the context of Plaintiff's POTS episodes.  Beyond Plaintiff's own testimony, references to tremors or trembling occur in the medical records sporadically.  On September 19, 2019, Dr. Hall documented Plaintiff's report that when he has episodes, he "feel[s] that his body is shaking." (AR 258.)  On January 17, 2020, Dr. Hall listed tremors on Plaintiff's "chronic problems" list, noting that they "[w]orsened during episodes of pots. Presents today associated with almost with a [*sic*] asterixis like spasm/tremor on top of irregular tremor."  (AR 345–46, 437.)  Likewise, "[d]izziness, [t]remors" appeared as "[p]ositive" in Dr. Hall's "Review of Systems" chart.  (AR 352.)  However, with respect to tremors, there is no further reference or explanation, including in the "assessment/plan" section, nor is specific treatment discussed.  (AR 351–53.)   Dr. Bui likewise mentioned tremors in passing, in notes which reflect that Plaintiff reports he "[w]ent to hospital September 11, 2019.  R hand was trembling . . ." (AR 339–44, 357–72, 381.)

The ALJ addressed Plaintiff's claim of hand tremors in his Decision at the step-two analysis, finding that "there is no evidence in th[e] medical records of any evaluation of diagnosis of this issue; therefore, his allegation of disability due to trembling of his hands

is considered to be a non-medically determinable impairment." (AR 24.)  Regardless of whether hand tremors were a separately diagnosed impairment, however, there was testimony and record evidence that Plaintiff experienced hand tremors as a symptom of POTS.  The ALJ may have been correct in his conclusion that there was no diagnosis of hand trembling as an independent impairment, but the ALJ erred in failing to analyze the trembling as a symptom. As addressed above, the ALJ did not specify what symptom testimony he discounted, so the Court cannot determine whether the ALJ failed to include limitations related to hand tremors in the RFC because he found this symptom testimony lacked credibility.  Therefore, the ALJ erred by neither properly rejecting Plaintiff's symptom testimony about tremors nor addressing them in his RFC analysis.

The ALJ made no mention of Plaintiff's vision issues in the Decision.  However, Plaintiff's claims of visual impairment caused by his POTS are reflected at several points in the record, including Plaintiff's testimony at the June 10, 2021 hearing.  For example, Plaintiff testified that during his "cyclical stages" of dizziness and lightheadedness, "[his] vision's gone."  (AR 64–65.)  Additionally, in an exchange with his attorney, Plaintiff stated "[w]ell, I'm taking medication regularly, so if I'm feeling well, then I'm usually mostly there, but I—my vision's still not all there.  This is why I saw the optometry specialist recently . . ." (AR 68.)  Medical records likewise include notes of vision-related symptoms. Dr. Taub noted in April 2020 that "[c]urrently [Plaintiff's] bothersome symptoms are not able to focus with his vision . . ." and others, alongside a brief statement that Plaintiff "[d]enies . . . visual changes . . ." (AR 275–76.)  References to Plaintiff's purported vision issues appear throughout the record in notes from Drs. Bui and Taub. (*See, e.g.*, AR 258, 275–76, 307, 409.)  The ALJ did not analyze those complaints in the Decision, include them in the RFC, or specifically identify them in the context of discounted symptom testimony.  Thus, the ALJ erred.

Regarding Plaintiff's episodes, nausea, and vomiting, the ALJ's Decision contains several cited references to Dr. Taub's and Dr. Bui's notes on the subject, with references to their opinions on the seizure-like episodes and nausea/vomiting.  (AR 25–26.)  The

ALJ's Decision includes a summary that "[Plaintiff] was diagnosed with epilepsy, unspecified, not intractable, without status epilepticus; however, Dr. Bui noted that the claimant did not have epilepsy by electroencephalogram (EEG) and likely the seizures were from POTS." (AR 26.)

However, the ALJ's determination that Plaintiff could perform medium work, limited as to only environmental factors, does not reflect symptoms of nausea and vomiting associated with Plaintiff's episodes. (AR 25–29.) Therefore, the ALJ erred by not either properly rejecting Plaintiff's symptom testimony about nausea and vomiting or addressing them in his RFC analysis.

**C. The ALJ's Errors are Not Harmless**

The Court finds that the ALJ's errors in failing to consider Plaintiff's limitations and symptom testimony merit reversal and remand. The Commissioner claims that Plaintiff has not "proved" that any error related to vision testimony was harmful because Plaintiff has not articulated the degree of visual limitation necessary to the RFC, and that because of this the error itself was harmless. Indeed, ". . . we may not reverse an ALJ's decision on account of an error that is harmless. [T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) *superseded on other grounds by* 20 C.F.R. § 404.1502(a). Likewise, there is a "general principle that an ALJ's error is harmless where it is inconsequential to the ultimate nondisability determination. In other words, in each case we look at the record as a whole to determine whether the error alters the outcome of the case." *Id.* at 1115 (internal citations and quotation marks omitted); *see also Shinseki v. Sanders*, 556 U.S. 396, 410 (2009). Though Plaintiff has not provided an exact counterfactual, given the circumstances of this case, Plaintiff has sufficiently articulated the error, the evidence in support, and the effects: essentially, that the ALJ did not give proper consideration to Plaintiff's testimony and impairments as discussed, and that had the ALJ done so, such proper consideration could have resulted in a different outcome. (ECF No. 13-1 at 16–20.)

Here, the ALJ's errors undermine the validity of the RFC. Specifically, the RFC was determined without properly assessing all claimed limitations and after discounting Plaintiff's symptom testimony without adequate support. SSR 96-8p, 1996 WL 374184 at *5–6; 20 C.F.R. 404.1545(a); *Ferguson*, 95 F.4th at 1199. The ALJ is owed deference where evidence is susceptible of more than one rational interpretation. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984). However, the ALJ must establish a written record sufficient to allow the Court meaningful review, and it is not the duty nor the prerogative of the district court to fill the ALJ's shoes, as it may not "affirm[] the ALJ's determination for a reason that the ALJ did not assert." *Ferguson*, 95 F.4th at 1203; *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir. 2014) ("[the Court] cannot substitute [its] conclusions for the ALJ's, or speculate as to the grounds for the ALJ's conclusions."). Through his silence on Plaintiff's vision issues, and his errors in considering and addressing Plaintiff's trembling, nausea and vomiting, the ALJ left the Court without an adequate record on which to review his decision and therefor remand is necessary. Likewise, the ALJ did not properly articulate and support his rejection of Plaintiff's symptom testimony and the Court is not at liberty to fill in the blanks, thus necessitating remand.

Moreover, his failure to adequately assess these limitations undermines the evidentiary value of the VE's testimony. *See DeLorme v. Sullivan*, 924 F.2d at 850 ("If the hypothetical does not reflect all the claimant's limitations, we have held that the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy"). The ALJ's decision reflects that he relied foundationally on both the RFC and the VE's testimony in determining whether Plaintiff could perform past relevant work, and whether Plaintiff could perform other jobs in the national economy.[10]

---

[10] "In comparing the claimant's residual functional capacity with the physical and mental demands of this work, and considering the testimony of the vocational expert, the undersigned finds that the claimant has been able to perform his past relevant work . . . ."

(AR 28–29.)  Thus, the ALJ's errors in the RFC substantially undermine the later findings which relied heavily upon them and render his denial of benefits unsupportable.

As the Court cannot say with any degree of confidence that the ALJ's errors were harmless, it must remand.

## VI.    CONCLUSION

For the reasons set forth above, the Court **GRANTS** Plaintiff's merits brief, reversing the decision of the Commissioner, and **REMANDS** this matter for further proceedings regarding Plaintiff's claims of visual impairment, pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk is directed to issue judgment in favor of the Plaintiff and against Defendant and to close the case.

Because the Court remands for the reasons addressed above, the Court does not address Plaintiff's remaining arguments that: 1) the ALJ's determination that Plaintiff is limited to medium work not supported by substantial evidence in the record; and 2) The ALJ erred in his analysis of Plaintiff's past relevant work.  (ECF No. 13-1 at 19–21.)

**IT IS SO ORDERED.**

Dated:  September 16, 2024

_Jill Burkhardt_
Hon. Jill L. Burkhardt
United States Magistrate Judge

---

(AR 28.)  "Based on the testimony of the vocational expert, the undersigned concludes that . . . the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  (AR 29.)

23-cv-01107-JLB